Jarvis v. Cuomo Good morning, Your Honor. My name is William Messenger, and I represent Mary Jarvis and nine other family child care providers. This case presents two questions. The first question, phrased in the words of Executive Order 12, is can the state require that these providers accept an organized voice in governmental decision-making on issues that affect the manner in which they carry out their profession? I submit that the answer to that question is no. How are they required to do it? These are people who did not want to join in the be represented, right? And the law allows them to communicate independently, so I'm not sure how they are required to accept this representative. Well, CSCA, as a matter of law, is the representative of all registered and licensed child care providers outside of the state of New York. So as a matter of law, the union is their exclusive representative for purposes of dealing with the state of New York, particularly the Office of Child and Family Services over regulations and other... So what do you want it to be? I mean, it's a majority vote that results in them getting this. What do you want it to be? That each individual be able to choose who represents themselves before government. So each individual would then go to the bargaining table if they wished? Well, there wouldn't necessarily be a bargaining table. It would be just as most, what do you call it, lobbying of government is conducted. Each individual or business chooses who they want to represent them before the government, and the government hears from a multitude of voices. It seems to me that as a First Amendment claim, you run into problems with Minnesota State Board v. Knight. Well, Knight considered a very different issue. The question presented in Knight was whether excluding individuals, in that case faculty members, from union meet and confer sessions infringed on their First Amendment rights. Well, that's what you're complaining about. You're excluded because they're the exclusive representative. Not at all, Your Honor. Help me out then. My clients don't claim or don't complain about being excluded. They claim or their complaint is being compelled to associate with CSCA because the CSCA is their representative for speaking to the government and contracting with government. But before Harris, before Harris, is there any, would there have been any doubt? Yet Harris didn't go that far. And aren't we really bound by what the Supreme Court has told us, that unless it gets rid of previous rules like Abood and Knight and so on, that we have to follow them? Well, isn't that really the situation we're in? And essentially what Justice Souter, writing for the First Circuit, said in Douglas-Denham? Well, Your Honor, prior to Harris, no court has ever held, even in Harris, that it was constitutional to collectivize independent daycare providers. Exclusive representation for employees had been upheld in Abood for being justified by the labor piece. But the distinction between employees and quasi-employees was a distinction that nobody thought of until Harris. So the question is, how far does Harris go? And it's hard to see Harris going beyond what it, I mean, it may go beyond it, and ultimately the Supreme Court may tell us that, but so far they haven't told us that. Well, prior to this, there's two answers there. First, these type of schemes are relatively new. The idea of unionizing individuals before the government who are not actually public employees. I believe the first child care unionization statute was in Illinois, I believe that was 2002 or 2003. And that was actually challenged before Harris. There was a case before the Eighth Circuit called Parrish, which had this very question. The case was ultimately dismissed as moot because those child care providers were not unionized at the time. So there very much was always this question of, can the government extend exclusive representation beyond the workplace and designate exclusive representatives to speak for people who are not public employees? And to this day, only one appellate... What's the basis in your argument for making the distinction? If you can be exclusive for employees, why can't you be exclusive for other people? It's the existence or non-existence of a compelling government interest. As the Supreme Court said in Knox, mandatory associations are exceedingly rare, and they exist only when justified by a compelling state interest that is also narrowly tailored... Why? That's what I'm getting at. You can articulate the test of a compelling interest. Why is the compelling state interest different in the two contexts? Because the labor peace interest, as the Supreme Court held in Harris, does not extend beyond full-fledged state employees. That again is asking us to read Harris more broadly. Harris made that distinction with respect to a very narrow, very important issue, as to which your second point goes, as to in terms of a compelling interest with respect to negotiation, which is the thing that we'd like to know. I mean, why in negotiation, when you have either a bargaining unit or you don't, as the presiding judge said at the beginning, why is there any difference between employees and quasi-employees? Because the labor... You were correct that Harris considered the question of compulsory fees. However, in deciding that issue, the union in the state of Illinois argued that the labor peace interest applies there. The labor peace interest is what justifies exclusive representation of employees, in Abboud and in Harris. So with employees, labor peace justifies exclusive representation, and the so-called free rider argument justifies compelling them to pay fees for it. Well, the fees have now gone. That's Harris. But I think what all of us are struggling with is, why do you think that labor peace isn't as significant an interest with entities as with... Or peace in terms of the regulatory interests of the state as significant as with employees, individuals? For the reasons stated in Harris. So the labor peace interest, as defined in Abboud, is the interest in avoiding conflicting demands from various groups of employees that can disorganize the workplace. But as the court said in Harris, first A, there is no state workplace here. All these individuals work in their own homes. Harris said that with respect to the personal care providers there. Harris specifically said that it wasn't dealing with exclusive representation. It was dealing only with fair share deductions. That was the issue there, but in the very next two paragraphs, the court goes on to explain why the labor peace interest doesn't apply. The first being the one I just said, there is no state workplace. And the second is that outside of the workplace, the government has no interest in avoiding conflicting demands from various interest groups. That's democratic pluralism. How would it work in practice if you're right? Let's say either all your clients or a few of them got together and picked a different representative. That's the right you assert they're entitled to. Yes, sir. And then they find out that the state's going to meet with the other group on a given day at 10 o'clock in a certain office. Does your client's representative get to show up at that bargaining session? No. No? We're not claiming any right to be heard. It would be much like almost any government program or even this government program before 2009. The state hears from a multitude of different lobbyists, some lobbying groups. They don't get to bargain. They don't get to bargain at all, or they don't get to bargain in a joint session? Which are you saying? There is no bargaining at all. At all. That's not what you're complaining about. Is that right? No. The complaint is that the state has made CSCA the mandatory agent of all providers, including my client, whether they like it or not. And it's that mandatory agency relationship that compels association as the 11th Circuit held in Mulhall. Isn't the only consequence the bargaining? No. It's that the CSCA, as a matter of law, speaks for all providers. They speak for them all when they bargain about a contract. When they bargain and also when they look for appropriations and regulatory changes to implement that bargaining. So the great harm there— All right. But just take the bargaining. When the other union, the voted union, is bargaining, what is it you want your people to be able to do? That's what I don't quite get. Not be associated with the union's bargaining position? That's a legal conclusion. In fact, what do you want them to be able to do? It's just that, Your Honor, that they don't want—when CSCA is speaking to the state and entering into contracts with the state, they're not doing it on behalf of my clients or their providers. So you don't want them to be bound by what the designated group achieves in the bargaining. Is that it? Yes, Your Honor. Or affiliated with CSCA's positions in that bargaining. So you're concerned that what, third parties are going to think your clients are somehow of the same view as CSCA? Yes, Your Honor. The state, as a matter of— So where's the evidence that anybody thinks your client— that anybody is thinking your client is affiliated or shares the views of CSCA? Well, I believe it can be proven. First, of course, this case is on a motion to dismiss. So on a 12B6 motion, we're looking at the face of the complaint. But as a matter of law, the state of New York has said the CSCA is now the representative of everyone and did it pursuant to a majority vote. Well, the problem I have with that is that the executive order, at least, clarified that the order didn't have any impact on the ability of child care providers to appear before state agencies or set forth any agreement between the agency and a unit representative. So that seems at odds with what you're arguing here. No, Your Honor. That's Section G5 you're referring to. Again, we're not arguing—the ability of individual providers to speak to the government doesn't make it okay for the government to compel them to associate with the unit here. How are you compelled to associate? You don't have to pay money anymore. But the union is their agent for speaking to the state. Except to the extent you want to be heard. You still have the right to speak on your own, it says here. Well, that would be true in any compulsory association case. Not necessarily. Not every union member gets to go to the bargaining table. Yes, that's true. You do have the exclusion. Your client has—the defendants have recognized your client's right to be heard in addition to CSEA, or am I missing something? It's the claim here, Your Honor. The claim—my clients are not claiming that their right to speak has been infringed upon, that the state is restricting their ability to speak. Rather, it's the state is forcing them to associate with CSEA. Now that you're not being required to pay fair share monies, how are you being required to associate? This goes to whether you have a plausible claim or not here. Absolutely. But it's the compulsory agency relationship, as the 11th Circuit held in Mulhall. There it dealt with employees, and the court held that compelling Mr. Mulhall, an employee, to accept a union as an exclusive representative, impinged on his associational rights because it thrust him unwillingly into an agency relationship. Here, a union is the only person who the employer has to speak to. That's not the case here under this order, if I read it correctly. But the ability to speak doesn't justify compelled association. If I may, I think a good example is Willie V. Maynard. It means you're not associated with them. As long as you speak up, you're not associated with them. If that were true, then Dale v. Boy Scouts v. America would have came out differently. In that case, the Boy Scouts were forced to associate with certain scoutmasters they didn't want to. The Boy Scouts were free to speak. In fact, they made it very clear they didn't want to associate with these individuals. They had a written policy on the matter. They filed a very public lawsuit. Yet it was still held unconstitutional because of compelled association. The motorist in Willie V. Maynard, he could say anything he wanted. He could say, I didn't want to live free or die. He could put bumper stickers on his car saying, I don't want to live free or die. But associating him with that message on the license plate, that was the compelled association. And an ability to speak doesn't justify an infringement. Are you going to address the second half of your? If I may, Your Honor. I'm sorry. Your time is up, but we do want to hear you on it. So please, go ahead. Thank you for the court's indulgence. A good faith defense does not, the union cannot raise a good faith defense in this case because intent is not an element or a defense to the First Amendment violation in this case. Now, you make the statement that where it's First Amendment, there is never a good faith defense. I believe that Greenwich says that there are some First Amendment situations, like First Amendment retaliation, where there is a scienter requirement. But is your argument that where there is no scienter requirement and it's a First Amendment, then there is no such thing as, I don't know if it's a defense or a requirement of a plaintiff to show, but that there it does not matter how honest, good faith or whatever the parties were as to past damages. That is your argument? Yes, Your Honor. Now, let me ask you about that. Does that mean that even if people were compelled, I'm not saying that that's this situation, by a law which later is held unconstitutional, that they are liable for damages? Yes, Your Honor. And if people are damned if they do, because if they don't follow the law, they'll be sued for not following the law, and damned if they don't, they are liable for damages? Yes, Your Honor. Isn't that the situation that the Supreme Court in Ritchie said was not? Ritchie is a completely different case. It deals with racial impact and racial discrimination, but the Supreme Court said this is one where you have two things that are coming this way, but where somebody would be required, well, then we'll say it's all right, even though what they did was racial discrimination. Isn't there something of that here? Without going as far as to say that in a First Amendment situation you can't get back damages, which is what the other side is sort of suggesting, isn't there something about where someone is damned if they do and damned if they don't that maybe that is a situation where they don't get damages? Well, that would be a more difficult situation, Your Honor.  Here it isn't compelled by law because the statute is permissive, not requirement, but then under the statute a contract is issued. Are we compelled by contract? That provides a very interesting question, Your Honor. If someone was compelled to do this, and of course, as you noted, here they were not. But they may have been compelled by contract under the original law. Contract is not the same as a statute, but it is still something that may cause you to be damned if you do and damned if you don't. Yes, but that wouldn't, of course, as noted, would be the situation here. Here, of course, the union and the state in their first collective agreement agreed to seek legislation authorizing the compulsory fees. And my time is going way over, so just very briefly, the key to our argument on good faith is that good faith relates to whether there was a deprivation under Section 1983. It relates to an element to the claim itself. It is not effectively an immunity for all of 1983 because, of course, Supreme Court and Wyatt held that it's not an immunity, yet the union effectively treats it here as if it was. We have allowed it even in the absence of an intent requirement. In Pinsky, Your Honor, it dealt with an ex parte use of an attachment statute, ex parte, and the court looked to the elements of that claim, which then analogized to malicious prosecution, which in turn required proof of malice and lack of probable cause. And so the analysis there of holding that the defendant could raise a good faith defense was it was relevant to the particular claim in that case. You're relying on Judge Newman's dicta in Greenwich, which says that where there is a direct First Amendment claim that's different from maybe different. He didn't say it was different. Well, with respect to whether intent is required to prove a deprivation of First Amendment rights, there's the Ninth Circuit case of OSU Student Alliance, the dicta from Judge Newman, as you mentioned, in Greenwich, and then also just going to the underlying elements of the claim. Compelled fees violate constitutional rights because they compel individuals to support speech with which they disagree. I submit that happens once that objectively occurs. I'd have to double-check one of the declarations in the record. It leaves a couple hundred dollars per person. I can find the answer. Only four with damages, Your Honor. No, I believe it would be a few hundred per person, but again, I can look to see if that's in the record. So, I mean, we're talking under $4,000 in principle, then plus interest? That could be, Your Honor. Again, I don't want to say exactly. I don't know off the top of my head. Would that have settled this? I actually thought it would settle after the count one was dismissed, but the good faith defense came up. I believe there were other issues at play at the time that may have led to this. Let's hear from your adversary. I know you wanted a few minutes in rebuttal. Am I right? Yes, Your Honor. Thank you. May it please the Court. Frederick Brody for Governor Cuomo and Commissioner Poole. I'm going to focus on appellant's first cause of action, and Mr. West for CSEA will focus on the second. This court should affirm the dismissal of plaintiff's first cause of action, which claimed that allowing daycare providers to unionize violated plaintiff's freedom to associate. The association at issue here is so minimal, so infinitesimal, that courts have never held exclusive representation by a union to violate nonmembers' associational rights. The statute at issue here, Labor Law Article 19C, imposes no burden on the plaintiffs. They are not required to join the union. They're not required to pay dues to the union. They remain free to oppose the union. They retain the right to deal independently with the state on any issue, including issues that are covered by a CBA or a collective bargaining agreement. Plaintiffs remain free to join a different union if they want, or to join no union at all. Exclusive representation in this case does not mean a closed shop. All it means is that if more than 50% of the bargaining unit votes for a union, then under Labor Law Section 695D, the state must recognize that union and talk to them. The state may still negotiate, as Your Honor pointed out, with individuals, groups, or other unions, but it's statutorily required to recognize CSEA and negotiate with them. So exclusive representation doesn't mean exclusive representation. Why don't they call it Thucydides, and then nobody would have any worry? In retrospect, that might have been a better term. But the Constitution doesn't worry about a change between Thucydides and exclusive, I take it? Well, I think there's a lot of case law on the concept of exclusive representation. So it is a thing in labor law. So we're stuck with that term. But I did want to point out that exclusive representation here, because of all the holes in this statute, is not the closed shop that Your Honors might think of when you look at traditional labor law. In Minnesota State Board Against Night, a case that Judge Raji pointed out, the Supreme Court held that non-members' associational freedom had not been impaired by the union's status as exclusive representative of the bargaining unit. The non-members in night were not required to join the union. They remained free, in the Court's words, to associate or not to associate with whom they pleased, including the exclusive representative. And the same is true here. Here, there are compelling state interests that support the statute, and those interests far outweigh the minimal, practically nonexistent burden on plaintiffs. The state has advanced three main interests in support of the statute. First, the well-being of the child care providers themselves. Second, the availability of daycare to the public. And third, the quality of daycare provided to New York's children. Now, those three interests are linked. The state believed that allowing daycare workers to unionize would lead to better working conditions, and that, in turn, would bring more providers into the market, and that, in turn, would increase the amount of choice available to parents and increase the quality of daycare. And those interests I would submit, and they were articulated in both the Executive Order of 2007 and the legislation of 2010, which adopted the Executive Order. Those interests are equal, if not greater than, labor peace as an interest to support the statute. And, in fact, when your honors look at the CBAs that the union did negotiate with the state, one finds that they promote both the daycare workers' welfare and the quality of child care. Just to give one example, the CBAs provided for state-funded grants to improve the quality of daycare. In the 2009 CBA, there were $11 million in grants provided over four years, and those are focused on increasing the quality of daycare. The quality grants in the 2013 CBA were raised to $16.4 million over three years. There's also a professional development fund. In the 2009 CBA, it was half a million dollars. In the 2013 CBA, it was $8.5 million over three years. Let me ask you just one question. If we were to rule against you, would we be saying that the word exclusive would have to be removed, or would we be saying that the word representation would have to be removed? That is, is what is going on here simply that they don't like the word exclusive because it connotes something about them, or are they saying that you can't have representation? Because if you can't have representation, then you're doing something to the rights to associate of that majority that wants to associate. I think Mr. Resinger's point is the latter, that you cannot have representation. The representation here is really so minimal. The point is that the unions over here— One of his concerns is that he thinks that his client is being forced to associate with you, and it seemed to me from the language of the executive order that there is no such compelled association, but the phrase compelled representative might be construed to suggest otherwise. Is that the only concern here? Do you want to change the language there so that you're not the compulsory representative or the exclusive representative? Well, let's be clear on this. The bargaining union, which is all of the licensed and certified daycare providers in upstate New York, voted by more than 50 percent margin to be represented by the union. Now— There's not going to be any other representative? You would have to speak as an individual? Is that what you're saying? Well, no, that's the wonder of this statute, Your Honor. The statute allows individuals or groups or even other unions to come in and advocate different interests if they wish. But what's important here is that if more than 50 percent of the bargaining unit votes for a union, which they did here, then the state has got to sit down with that union and negotiate. They may negotiate with others. They may sit down with others. But all the statute does is it says if more than 50 percent vote for the union, the state's got to sit down with them. What's negotiated is contract. And how much of it is negotiating what New York may then adopt as policies, even legislation? That's a good question, Your Honor. And the statute makes clear, and I think the section is section 695F, that the purpose of sitting down, the purpose of these negotiations is for the purpose of entering into a written agreement. That is 695F. The CBAs, when the court reads them, and there are two of them in the record, deal with nuts and bolts workplace issues, staffing ratios, health insurance, workplace inspections, dispute resolution, payments and billing, professional development. All right. I understand that. So now this is negotiated and what? A representative from the state of New York signs it and a representative of the union signs it? Correct. And it binds every facility in the state of New York? Well, it confers benefits on everyone who's in the bargaining unit. It doesn't, and let me make this clear. You know, one person's benefit is another person's obligation, but it would apply then to the plaintiff's facilities. It would apply to them, particularly if they're getting money from the state. Yes, I understand. If they have children who are paid for by the state as among the people they take care of, then they are bound by that agreement. That's right, and it also constrains the state's action when it's inspecting workplaces, for example. Well, when you say, and it's very helpful, that the benefit they negotiate applies to every provider in the geographic area, right? Right. So when you say, but they're free to have their people bargain. That's right. So after the designated unit bargain and gets X dollar of benefit, can they come in and say with their designated unit, that's not enough, we want X plus 20%. Isn't the state going to say, no, you can't have that, we've already negotiated a contract that covers everybody, right? With respect to your first question, yes, they could try to negotiate something different. But it's hopeless, isn't it? Well, that's right. So when you tell us, oh, they're free to bargain, after a contract has been negotiated, isn't that just an illusory right? Right. Well, I'm not going to say it's illusory, because I don't know how, I'm not going to speculate on how those discussions would come out, but I will prefer that we. If the state has already negotiated a contract that covers everybody in the unit, you mean to say the state's going to say, oh, yeah, we might give you other people more? Well, if they wanted something that's totally outside the contract, they might be able to. More, just more. You gave us X dollars, we don't think that was enough. Just more, it's highly unlikely. It's impossible, isn't it? Well, let me refer the court, though, to the Knight case again, where the Supreme Court said, look, we recognize that when there's a democratically elected union, as there is here too, that management is going to listen to them, and management might not want to listen to anyone else, and that's okay. Maybe before the contract's negotiated, they might listen to them and say, well, the union has one proposal, these people have another, they're all interesting, and we'll think about it. But once it's negotiated and signed, for you to tell us they're free to negotiate, I just don't understand what they're going to negotiate about. Well, I would expect that OCFS is going to follow the contract once it's signed. So at that point, you agree the contract binds all providers, both as to obligations and benefits, right? I would say it binds all the parties, but I would say it doesn't put an identified burden on the providers, it just gives them benefits. Well, benefits, but you've also bargained that you're going to have certain health requirements, that you're going to have certain hygiene requirements. You've agreed to certain conditions, and then you'll get paid by the state of New York. So they'll have to comply with those conditions, like every other facility in the union, right? Well, there are regulatory conditions that we, the state, impose that everyone's got to comply. And that's part of the negotiation, or not? Well, there are regulations, and the way they're implemented is a subject of negotiation. For instance, people who the state comes out and inspects their workplace, they have certain rights to get a written report of the inspection, to have an exit interview, those sorts of things. Right, but the essence of the unit is that everyone joins in it agreeing to be bound by the majority's decision. They're saying, we don't want to be part of the unit, we don't want to be bound by a majority decision as to who's going to speak for us. And that's, as I now understand it, the essence of their claim. So how is it that they can be forced to basically be bound by decisions that are negotiated for them by someone they don't want to be their representative? Well, it's the same as in any democratic institution, where the majority voted for the union, the union then represents the party. And your legal authority for saying that they have to be bound by that is? Because that's what they're saying. They're saying, you're saying we have to be associated with a union, and we don't want to be associated with them. I would say that Knight certainly says that they are. You're making two separate arguments. The first argument, which we've been pressing on, is that they are not being made to do anything. And we find that rather difficult in a situation in which, as a result of a people whom the state is bound to negotiate with, results happen that, as a practical matter, will have an effect on them. Even if, in theory, they could do something else, but as a practical matter, they do. The second argument you are now making comes back to what we said about Knight and the other things, which was that unions are allowed to be set up where there is a majority. And that applies to employees. And there is no real difference between that and quasi-employees, never was in terms of all the benefits. And that that still is so, despite the fact that Harris made a cut into it with respect to payments. Now, that's a very different argument from the argument that says that there is no binding, no effect. But what are they complaining about? Just a word. Which one of these arguments are you really making? Well, I agree with both of the arguments that Your Honor stated, and I think the state wins under both of them. All right, let's hear from counsel. Mr. West, is it? Yes, it is. Thank you, Your Honor. Maybe I could just, I'm going to speak mainly about the good faith defense, but if I could, let me just follow up on the current conversation. Here's what the statute says, that nothing shall interfere with the ability of any child care providers or child care provider representatives to meet or correspond with any state agency with regard to any matter of relevance. That's from the statute. There's similar language in the collective bargaining agreement. I think what this means is there is no bar to any individuals or through an association to talk with the state if the state is willing to listen to them. Yeah, okay. They can talk, they can write letters, they can speak on the village green. Yeah. But once the contract is negotiated with the designated unit, would you agree that they do not have the right to bargain for different terms? The state has bound itself to that contract. I understand the state is bound. Do you agree they no longer can bargain for different terms? I think they could perhaps try to, but they would be unsuccessful because the state has bound itself to a contract. I mean, this is ‑‑ well, try to. I mean, maybe just ‑‑ For a cold comfort. You mean they write a letter saying we'd like to bargain, they get a letter back saying you can't? I think where they can express themselves more readily is to the extent there are issues that go beyond the specific issues that are part of the contract. Oh, sure. If it's not part of the contract, they have some options. Let me just point out that, you know, as far as ‑‑ Your colleague at one point talked about they were free to bargain. That's all I'm quarreling with. Yeah. I think the way to look at this is that the state has bound itself to use the term from night. I can't say the state is bound. The point is they're bound also, right? They are bound in that the state has entered into a contract and has agreed that it is not going to listen to other providers. I don't know why it's so hard for both of you on your side to resist the simple conclusion, yes, they are bound. They are bound in the sense that the contract is negotiated on their behalf. That's what bound means. Before a contract, they can do much more than in an ordinary union situation. But once the contract is reached, they are not that different from an ordinary union situation. Okay? Absolutely. Just ‑‑ I understand that. When the contract is being negotiated, if they want to be at the table, do they get to be at the table? I don't believe so, Your Honor. I think the statute provides that the ‑‑ I mean, that's really what is the meaning of the term exclusive, that the state has agreed that if a union is chosen by the majority, as it has been here, that the state will negotiate with that entity over the terms and conditions of employment. And it really is. I agree it's not really any different from any other union representative. This concept of exclusive representation is really the foundational principle of American labor law. All this language from the executive order is really a bit of a red herring in the sense that it doesn't impact any ability that they may otherwise have to meet or correspond. Well, when the negotiations are going on, they have no right to meet or correspond. Is that what I'm to understand? Because there's a representative, and that's who you're going to bargain with. I think they have no right to be part of the bargaining that is going on between the union and the ‑‑ No, but oddly, the main thrust of what makes this different is just the linguistic that they are able to say more dramatically than in other contexts, hey, we are not really part of the union. We are not really part of them. We don't associate with them, and so on. But all of the fluff, the language, which they seem to be objecting to, actually they're allowed to, say, wave a flag and say we're not part of it. But in terms of being bound, they're pretty much as in any other union situation. Yeah, it's not significantly different from any other union situation. I agree with you. I'm sorry. Your co‑counsel said that this wasn't the equivalent of a union shop. Well, union shop has a very specific meaning in labor law, Judge Raggi, which means that not only do you have an agency fee, as we did here prior to Harris, but that the people are required to join the union, and that is no longer legal sensitive. But what we've got here is that the only person that's going to speak for them, because this is a First Amendment claim, the only person that's going to speak for them to the state is the union, and they don't want that. And so why do they not have a First Amendment argument? Because now we're getting a little closer to what it reduces to. The only person that is going to speak for them in negotiations with the state over the terms and conditions of their employment is the union. And they're saying that violates the First Amendment, so now tell us why you don't think that. That is precisely the argument that was rejected in Knight. Yes. So we're back to the question of whether there is a, which Judge Newman asked, of whether there is a significant difference with respect to this between employees and quasi‑employees. Because Knight and everything that the Supreme Court has said, said with respect to employees, this is okay. So unless Harris goes beyond the payment of dues, that is still the law. If Harris does not go beyond that, we're stuck with that, whether we like it or not, because the Supreme Court has told us, don't go where we're going, go where we have been, and we'll tell you when you can get away. So the question is, how far does Harris go in changing that? Yeah. I think what Harris deals with, and I will emphasize that my friend, Mr. Messenger, who argued the Harris case specifically represented to the court that exclusive representation was not an issue in that case. What Harris deals with is, assume you have a need for the government to show a compelling interest, which you did in the context of collecting agency fees. What the court said in Harris is that the government, where you're dealing with so‑called non‑full‑fledged public employees, does not have the same compelling interest. Harris, on its own terms, did not deal with exclusive representation. Right. It dealt only with fees. Yes. Knight and the previous cases dealt with exclusive representation. Exactly. So that's where we are. And we have no need to get to this issue of what Harris said about compelling interest, because given that there is no infringement on their First Amendment rights, as the court held in Knight, there is no need for the government to show a compelling interest. That would be our submission. Let's get to that. Yes. So I think there are three problems with my friend's argument that the good faith defense does not apply because, as I believe he said it, intent is not an element of the plaintiff's First Amendment claim. The first problem with that is a very obvious one, that no court has ever accepted that argument. And that is so even though ‑‑ Well, but, you know, as Judge Newman suggested in Greenwich, where you have a plain, clear First Amendment claim, not a retaliation, nothing else, and get away from the moment, from this particular situation of labor and abode and all of that, but just a straight First Amendment claim, somebody finds that a statute violates their First Amendment claim. Do they have a right, even though the people were following the statute in good faith, to get damages for that before them? That's the question. And, you know, I might feel one way about this case, but isn't there something to be said for somebody who has had their First Amendment claims violated and now are asking for damages for that in the past? I don't know. Well, I think the teaching of, first of all, the ‑‑ let me start here with the Supreme Court because we've had at least three cases in which the court, and I agree this is dicta, but it's well‑considered dicta, that because of the ‑‑ and it's precisely in the cases where the court has declined to extend qualified immunity to private parties who are sued under Section 93. And the court in all three of these cases, in Lugar itself, in Wyatt most extensively, and subsequently in Richardson, the court has said, but we are not foreclosing the possibility that private entities sued under Section 1983 can invoke a good faith defense. And that's perfectly fine in any number of situations where ordinary tort law would have such a defense, which is what then has tended to happen. It's what we did in Pinsky. It's what the Fifth Circuit did when Wyatt was sent back to them and so on. But my question is, yeah, they were speaking broadly. What do we do in a situation where the initial claim does not require cienter on the other side and where the people who did it were completely innocent? I'm keeping aside the situation where they were compelled because that may be different. But, Judge Calabresi, I believe, if you think about it, the situation that you had in Pinsky and the Fifth Circuit in Wyatt and, indeed, also in the Supreme Court in Lugar as well, these cases that arise out of attachment and garnishment statutes, the claims in those cases, the claim that the Constitution was violated, did not depend on any showing of cienter either. It was a claim that the litigant's due process rights had been violated because his property was taken from him or attached without due process of law. And that is—  So there is a difference. Yeah, and what the Court has done in some of these cases— so it's not—the actual First Amendment claim that is made in this case is no different than the due process claim that was made in those cases in that the constitutional claim itself, the question of whether the person's constitutional rights were violated, does not turn on cienter. There's no cienter element either in the due process or in this First Amendment claim. What the courts have done is have looked in Wyatt and this court in Pinsky and some others at, well, how can we analogize this to some kind of a common law claim? And they talk about malicious prosecution or abusive process, which do require cienter. But I would say two things about that. First of all, nowhere in any of these cases do any of these courts say that this is necessary in order to invoke the good faith defense. To the contrary, if you look at the three separate opinions in Wyatt particularly, as well as other cases, there is an emphasis on this is an appropriate thing to do because of the inequity. The difference between cienter and good faith defense would be essentially whose burden it is. If cienter is required, then the plaintiffs have to show that there was cienter. If it's a good faith defense, it's the defense that has to show that they were in good faith. So I can see the difference. But what I want to know is you would like us to say that there is a good faith defense to any constitutional violation because that's what you're doing with due process, that the First Amendment is no different. And then I'd like to know what's the difference between this good faith defense and qualified immunity, which was rejected. I mean, I know the court said we're not denying it, but what's the difference? Well, the most obvious difference is that qualified immunity is immunity from suit so that if you're entitled to qualified immunity, the suit is dismissed at the outset, and if the district court gets it wrong, you have an immediate right of appeal. There's no claim of that here. You could have a suit, but if a defense is made out or if it is on the face of a complaint as a matter of law, that has a different effect. But that just goes to damages, not just to the suit. It goes to damages. There is no claim here. We do not claim that because of this good faith defense. And let me just add, Chief Justice Rehnquist had what I thought was a very helpful footnote in his dissent in Wyatt where he says this is a bit of a misnomer, but we'll use it, you know, as a helpful shorthand here. But whatever we call it, the good faith defense here, I apologize. I've lost my train of thought. I got confused. I'll ask you a question. Okay. This is not a case where the plaintiffs are suing for what I would call ensuing damages in the sense that somebody says, well, I was damaged because you did X and then I lost my job or then this, that, and the other. They're saying we gave you money, so we're out of pocket. The money is in your pocket. You shouldn't have collected it, and therefore we want it back. Now, you know, if this were money that had been put in a segregated account and we knew exactly that this was plaintiff's money, I think you'd have a hard time saying that equity entitles you to keep it rather than giving it back to them. I asked how much money was involved because recognizing its fungibility, we're not talking about much. Why don't you make an offer of settlement here? Indeed, I would think it would be in your interest to make an offer of settlement rather than risk the attorney's fees piling up in the case. Well, we thought and hoped that the case was going to be resolved once we stopped collecting the agency fees after Harris and refunded with interest everything. Refunded after Harris. Yes, exactly. But as I understand it, there are four years before Harris. Well, I think three is the statute of limits. Indeed, I mean, I've now found out it's not a lot of money in principle. It is not a lot of money, and I think we pointed this out in a footnote in our brief. I don't recall that we've had any discussions about this, but I think the problem is we have a union here that is involved in representing child care workers. There are numerous other unions, some of which are affiliated with the same parent union, some of which are not, that also represent child care and day care workers throughout the country that have had agency fee relationships. Mr. Messinger, my friend, is suing all of them, and there are a number of cases which are brought as class actions where there are tens of millions of dollars at stake on exactly the issue that we're talking about here. How much settlement fines anybody? But let me ask you this to go back to my original point. As between money that went into your pocket wrongfully and then being out of pocket, I don't understand where equity would say you get to keep the money. Judge Rodgers, in fact, the case law is to the contrary, and I would point you to cases that we cited at the very end of our brief. There's an Eighth Circuit case, Americans United. I certainly understand if you wanted to argue to me that you spent the money, it's not something you can return, whatever, but you're arguing basically that because you collected it when you thought it was lawful, you don't have to return it even though you now told that the collection was unlawful. And I think that's exactly what the – I mean, first of all, let me just point out one thing. This is not money that's been collected and put in somebody's pocket. This is money that has been collected to defray the costs of union representation for these people. But we now know you shouldn't have been allowed to. We know that after it. Yeah, but what you're saying is it isn't that this money is now here. It was spent improperly for their benefit so that it's a little different than a situation if your money, it's my money, no, it's yours. This was money which we improperly spent for them when we shouldn't have done it. Now, do they then get the money back because it was improperly spent even though whatever benefits they may have gotten from it can't be taken away from them? It's a little more complicated, but the First Amendment issue, that is, if a First Amendment or due process, whether in such situations a defense should be allowed is still there. Yeah, and Judge Calabresi, let me point out as far as the due process issue, there is a due process issue lurking here under the surface, and that is this. Let me just state a slightly different hypothetical. There's not a lot of money at stake here, but if the Supreme Court had gone ahead with what some people thought might have happened in the Friedrich's case and overruled 40 years of precedent and held that public sector unions— Of course, the whole argument was made hoping that Friedrich would come out one way. But in that case, you would have had every public sector union in the country that collects agency fees on the hook for millions and millions of dollars in damages for doing things that at the time they did them there was binding Supreme Court precedent that nobody had really questioned that said this is perfectly constitutional, and there's really a due process question. Do you think your clients understand that if they should lose on the obligation to return a few hundred dollars, they will be liable for attorney's fees, which is fair to say will be considerably higher? Do they understand that? That's all I'm asking. Yes, I'm sure. You've advised about that. They certainly do. I mean, there have been discussions of this all along, and I think there's some concern about a point of principle here, too. I don't want to get into that too much, but I think the— All right. Thank you. Thank you, Your Honor. Let's hear from Mr. Messenger. You have a few minutes, Mr. Messenger. Thank you, Your Honor. I want to address a question from Judge Calabresi, which is, what is the difference between a good-faith defense and an immunity? I think it really goes to the key of the second issue here, and the difference is in the statute. A good-faith defense relates to the underlying claim, whether there was a deprivation of rights under 1983. Well, that depends on how we read it. I mean, one could create a good-faith defense, which is essentially saying the Supreme Court didn't want to give full qualified immunity to these people, but wanted a defense which was something less, which was a defense against damages but not against suit. Classically, we viewed a good-faith defense in tort law as having its own term, but the question is what was the Supreme Court in that case when it rejected Rehnquist's wanting a qualified immunity and said, well, but there may be something else. What did they mean by that? Exactly, and by saying that it wasn't an immunity, what they meant, I submit, is that it isn't intrinsic to 1983 itself because an immunity, of course, is that even if you violate 1983, you are immune from it. So it doesn't matter what the claim is. And you opposing counsel says that this defense has been recognized in this circuit in cases where scienter was not there, where the underlying tort did not require it, where due process had been violated. If that is so, if that is what Pinsky held, then Pinsky binds us. What is the difference between a First Amendment and a due process violation in terms of the existence of such a defense? Why is the First Amendment more important or not subject to this defense when due process is? If that is so, if I'm wrong, that's what opposing counsel has said. Could you look to that? Yes, it's not a question of importance, but it's a question of what are the elements for the deprivation. So returning to 1983's language, it provides a cause of action for deprivations of constitutional rights. What's a deprivation of constitutional rights varies depending on the right, a Sixth Amendment claim, First Amendment claim. No, but if it's due process and it's a claim that doesn't have scienter and doesn't have anything else, then why isn't it the same thing as First Amendment? Well, if there was a due process claim that didn't require intent, then the good faith defense wouldn't. Opposing counsel specifically argued that in the cases that have come out granting such a defense that some of them, including Pinsky, they said, and I'll have to go back and reread Pinsky, there was nothing in the inherent tort claim that required scienter or something like it. So it wasn't like Greenwich retaliation First Amendment, which does require it, but was like this one where there's nothing. Of the appellate court decisions, they all involve ex parte due process violations. So this court's decision in Pinsky, the Fifth Circuit decision, Wyatt v. Cole, Third Circuit decision in Jordan, Sixth Circuit decision in Duncan, all involved use of an attachment or a plebence statute, ex parte, that was later found unconstitutional, and the courts analogized back to what was the element required to prove this violation, and they analogized it to malicious prosecution, which requires malice and probable cause. Let me ask you, I don't think you're disputing that a government defendant in this case would have the benefit of qualifying. No, Your Honor. We're not seeking damages. Is there any argument you want to make to us as to why the private defendant, nevertheless, suable under 1983 for state action, doesn't get the benefit of the change in law under a good faith theory so that he's got less protection than the state actor other than that the Supreme Court says immunity and good faith are not the same thing? Is there any reason to treat the private actor more severely than the public actor in this scenario? Yes, Your Honor. It comes down to the statutory text as defined in Wyatt. And so Wyatt noted the reason immunities are created is not because of equity. It's because if an immunity was so strongly supported by common law and by policy interest that Congress wouldn't have intended to abrogate it when it passed 1983 and 1871. What statute are you talking about? I mean, these are 1983 actions under the First Amendment, and why is it that the state actor has greater ability to escape liability in these circumstances than the private actor? What is it? Because in Wyatt, the court held there was a firmly established government immunity because of the need for government. I understand the Supreme Court says that the immunity and good faith, but is there any other argument? I mean, we will follow the Supreme Court to the extent we have to, but in reading the Supreme Court's decision, there may be a question as to whether they considered this circumstance. And so I'm looking to see if there's any other reason you think we ought to say the state actor gets more protection than the private person. Because the policy reason that justifies the immunity for the state actor doesn't apply to a private party. Wait a minute. That's very hard to understand when the Supreme Court tells us they put the immunity into the federal cause of action because they were construing the statute in light of the common law. So how did it get better when it became federal when they say they started from the common law? Because the reason the immunity was created was because of the interest in not interfering with the government's ability to carry out its functions and interfering. But they said they took it from the common law. It was based upon common law, but the interest, they said, was not transferable to a private party because the interest in government operations. Is that common law distinguished between the state actor and the private person? Is that the point? Yes. In Wyatt, the court pointed out the two grounds. Now follow the question. Are you saying the common law distinguished between the state actor and the common law for purposes of the defense? In terms of an immunity, yes. Let's think that through for a moment. New York passes a law that requires the private party now to collect the fees, right? I mean, they wanted this law, but that's what it requires them to do. What are you saying they should do in that circumstance to avoid liability? Say that they violate the New York law? Well, it didn't require they collect the fee. It authorized them to, and, of course, the state and union decided to. So it wasn't the fee acts, which were passed as part of the budget amendments, just made it possible. So you're saying that it authorized them to, and they should have said to themselves, you know, this could have First Amendment consequences. We're not going to collect it. Yes, and in the first collective bargaining agreement, when they called on the state to pass just that very law, at that point no court had ever held it constitutional to force non-employees to pay compulsory union fees at that point. And the union should have known that at that time. If the law does not require it, and I agree with you that it does not require it, but the law requires a contract to be set up, in effect, exclusive representation in your contract and so on, and then as a result of a contract in which the state takes a part and says here's what we want done, there is this requirement of the fee. This may not be required by statute, but it's required by a contract that the statute essentially requires because it requires a union contract. But isn't that a requirement just as much? Well, no, because the Representation Act doesn't require a compulsory fee clause. The union didn't have to seek it. It chose to seek it, and then it chose to seek the legislation. There was nothing— Now you're saying that they chose to seek. I'm saying I don't want to get into that. The statute is there, and now under the statute, the state negotiates with the union, and in that negotiation, in a contract, who imposes what? It's both sides, so the state, as much as the union, comes out of this contract with an obligation. Well, both sides have an obligation, but on the compulsory fee clause, it was rather clear it was sought by the union. The union took on the burden of actually setting up the administrative procedure to take the fees. What did Wyatt mean when it said that it might be that there is a scienter defense and a good faith defense, even though there is no qualified immunity? Did it mean only in those situations where scienter was part of the common law? If that's so, then all they needed to do was say scienter. Or did they mean there may be a good faith defense, which isn't quite qualified immunity, but which protects these quasi-state actors for reasons analogous to the kind of thing that the presiding judge suggested? I submit that they meant it in terms of whether or not there was a deprivation and there was language in Wyatt where they distinguish an immunity from a defense and say a defense relates to whether a wrong occurred. An immunity relates to whether someone is immune even if a wrong occurred. So defense goes to whether there was a deprivation. Here it's not relevant to whether there was a deputant. What does good faith mean? Why do they just say whether a wrong occurred? Good faith suggests something else, suggests something on the part of a person. There is a wrong, but there was good faith. Well, it's used as a shorthand, as this court said in Pinsky, the actual requirements of that statute were malice and lack of probable cause. That use of this ex parte attachment statute later found those constitutionals wrong. All right. Thank you very much. Thank you, Your Honor. I want to thank all parties for your arguments. We're going to take them. The last case on our calendar today is on submission, so we stand adjourned. Court is adjourned.